1  EILEEN M. DECKER
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   ANDREW BROWN (Cal. Bar No. 172009)
4  Assistant United States Attorney
   Major Frauds Section
5      1100 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone: (213) 894-0102
7      Facsimile: (213) 894-6269
       E-mail:    andrew.brown@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10             UNITED STATES DISTRICT COURT

11       FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 IN THE MATTER OF THE EXTRADITION     Misc. No.  **16-1394M**
   OF
13                                      COMPLAINT FOR ARREST WARRANT AND
   FABRICE FELIX STEPHANE TOUIL,        EXTRADITION; ORDER THEREON
14
                                        **(UNDER SEAL)**
15 a fugitive from the Government
   of France.
16

17

18

19      I, Andrew Brown, being duly sworn, state that I am an Assistant

20 United States Attorney for the Central District of California and

21 that, upon information and belief, the following is true and correct:

22

23 1.   In this matter, I act for and on behalf of the Government of

24 France.

25 2.   There is an extradition treaty in force between the United

26 States and France, the Extradition Treaty Between the United States

27 of America and France, U.S.-Fr., Apr. 23, 1996, S. Treaty Doc. No.

28 105-13 (1997), *as amended by* the Instrument as contemplated by

                              1

1   Article 3, paragraph 2, of the Agreement on Extradition Between the

2   United States of America and the European Union signed 25 June 2003,

3   as to the application of the Extradition Treaty Between the United

4   States of America and France signed 23 April 1996, U.S.-Fr., Sept.

5   30, 2004, S. Treaty Doc. No. 109-14 (2006) (collectively referenced

6   hereafter as "the Extradition Treaty").

7   3.    Pursuant to the Extradition Treaty, the Government of France has

8   submitted a formal request through diplomatic channels for the

9   extradition of the Fabrice Touil, a French national who is also a

10   citizen of Israel.

11   4.    Fabrice Touil is charged in France with fraud committed as an

12   organized gang, in violation of articles 313-1, 313-2, 313-3, 313-7,

13   and 313-8 of the Penal Code of France; and money laundering committed

14   as an organized gang, in violation of articles 324-1, 324-2, 324-3,

15   324-4, 324-5, 324-6, 324-7 and 324-8 of the same code; both committed

16   within the jurisdiction of France.   The warrant for his arrest was

17   issued on June 3, 2014, by Renaud Van Ruymbeke, Senior Vice President

18   in charge of Investigation at the High Instance Court of Paris,

19   France.

20   5.    The following facts are contained in the extradition request,

21   except where noted:

22        A.    Summary of the Fraudulent Scheme

23        Fabrice Touil and his co-conspirators, including his brother,

24   Mike Touil, and other members of his family and friends, operated two

25   sham business entities--B Concept and Euro Trade Energy--for the

26   purpose of collecting Value Added Tax ("VAT") of 19.6% on the sale of

27   carbon credits (*i.e.*, rights to pollute through the emission of

28   carbon dioxide and other greenhouse gases) in France.   Instead of

1  turning the VAT proceeds over to the taxing authority of France as

2  they were required to do, Fabrice Touil and his co-conspirators kept

3  the VAT funds they had collected for themselves.

4      The conspirators employed three main means of making their

5  scheme harder to detect.  First, they used a series of shell

6  corporations in different countries to buy and sell carbon credits so

7  that it would be difficult to trace transactions to the corporations

8  that owed VAT.  Second, they listed their shell corporations mostly

9  in the names of other persons, whose identifying information they

10  purchased, so that the fraud would not be traced back easily to

11  themselves.  Third, they abandoned their shell corporations quickly

12  to stay ahead of investigations into them.  As a result of this

13  fraud, Fabrice Touil and his co-conspirators collected well over 60

14  million Euros ($68 million), which was then laundered through a

15  series of bank accounts held in the name of sham businesses, at least

16  some of which Fabrice Touil controlled, mostly in foreign countries.

17      **B.   "B Concept" Was Used to Steal Over 41 Million Euros in VAT**

18      B Concept was incorporated in France in October 2007 with 10,000

19  Euros in capital, and was dissolved in June 2009.  Money, in the

20  amount of 460,000 Euros (approximately $512,000), which funded B

21  Concept's initial purchase of carbon credits, came from the Israeli

22  bank account of Sarah Benattia, who is the wife of Raphael Haddouck,

23  a friend of Fabrice Touil's.  B Concept collected over 1.3 million

24  Euros ($1.5 million) in VAT in 2008, and over 40 million Euros ($45.7

25  million) in VAT in the first five months of 2009, by selling carbon

26  credits.  It did not file tax returns or turn over any of the VAT

27  collected.

28

1   According to its articles of incorporation, B Concept had two
2   partners, William Block and Guillaume Girard.  William Block is a
3   blue-collar worker who was recruited by Jeremy Lalloum--a man who has
4   been indicted in France for his participation in the VAT scheme
5   described herein, and who has admitted providing strawmen at Mike
6   Touil's request--and was given 5,000 Euros (approximately $5,570) to
7   open a bank account in the name of B Concept.  Although William Block
8   nominally ran B Concept, he told French investigators that he has
9   never conducted any business involving carbon rights.  During a
10  business meeting with the pollution exchange, someone knowledgeable
11  about finance pretended to be "William Block," the nominal CEO of B
12  Concept, but in fact did not fit the real William Block's physical
13  description.  Guillaume Girard was not in fact involved with B
14  Concept at all, and William Block does not know him.

15      B Concept was required by law to maintain an accounting of its
16  operations and inventory, but it did not do so.  Although it is
17  difficult to determine B Concept's "business" model, as it did not
18  keep records, it was prepared to sell carbon credits at a loss, which
19  would not ordinarily make economic sense.  This business model did,
20  however, enable B Concept's operators to keep the VAT for themselves.

21      B Concept obtained carbon credits through a web of transactions.
22  It purchased credits from two suppliers, GT Capital and C Power,
23  which, like B Concept, were only shell corporations run by figurehead
24  managers and which also did not file VAT returns.  GT Capital and C
25  Power had purchased the credits from two other suppliers, who had in
26  turn obtained the credits from Climate Corporation, an Austrian
27  company.

28

C.   "Euro Trade Energy" Was Used to Steal over 23 Million Euros in VAT in 2009

Euro Trade Energy was a limited liability company registered in Paris in November 2008.  It traded carbon credits from January through June 2009.  In that time, it collected over 23.5 million Euros ($26 million) in VAT.  It never filed a tax return nor turned over any of the VAT collected.

As with B Concept, Euro Trade Energy was a shell.  It maintained no accounting records, although required to do so by law, and had no physical office or paid employees.  Many of the documents used to set up Euro Trade Energy bore forged signatures and reproductions of notaries' seals.

The nominal chairman of Euro Trade Energy, Rui André Maciera Brandao, did not in fact manage the corporation.  By trade, Mr. Brandao is a garbage collector.  He explained to investigators that he had sold his identity documents to a man named "Blaze" associated with Franck Bismuth, an individual who had dated a prostitute who served as Euro Trade Energy's Danish "representative."  Mr. Brandao specifically denied conducting several actions done in his name on behalf of Euro Trade Energy, such as signing the articles of incorporation and the carbon register, opening a bank account, and using an email address that contained part of his name for Euro Trade Energy's banking.

1.   Fabrice Touil impersonated the nominal CEO of Euro Trade Energy to place carbon trading orders

Voice analysis of the recorded telephone orders on the carbon trading market purportedly placed by Mr. Brandao, the garbage collector who was the nominal chairman of Euro Trade Energy, reveals

1   that Fabrice Touil impersonated Mr. Brandao and placed the orders

2   himself.

3        The voice analysis was performed by Gaelle Jardine, an Engineer

4   at the Signal Analysis and Processing Laboratory of France's

5   Department of the Interior.  She compared the recorded carbon trades

6   of the purported Mr. Brandao on the one hand with known voice

7   exemplars from several conspirators, including Fabrice Touil, on the

8   other.  The known voice exemplars were taken from wiretaps of Fabrice

9   Touil's parents' telephones.  She then created models for the

10  speaking voices of these individuals.  While this was not true of all

11  the subjects, she had sufficient samples of quality recordings to

12  make a voice model for "Fabrice displaying the best possible

13  quality."  Engineer Jardine ran those voice models through a software

14  suite called Batvox to compare them and reference voices to the

15  recordings of the purported Mr. Brandao.

16       According to Agnitio[1], the company that makes Batvox, its voice

17  analysis software was first developed at the Technical University of

18  Madrid and is now used in legal proceedings in 35 countries, mostly

19  in Europe and including France.  It compares voices and calculates

20  likelihood ratios that they are from the same person.  "Likelihood

21  ratios" are a statistical concept for comparing whether one

22  hypothesis or another is more likely true.  In this case, the

---

24       [1] The information that is identified as coming from Agnitio was
25  provided to me directly from that company's personnel through
    interviews and technical documents, most notably the academic twin
26  study described later, and was not included in the extradition
    request from France.  It is included here so that persons unfamiliar
27  with Batvox can better understand the voice analysis report that
    Gaelle Jardine performed with that software, which was included in
28  the extradition request.

competing hypotheses would be, for example, "the caller requesting the carbon trade is Fabrice Touil," versus "the caller requesting the carbon trade is not Fabrice Touil."

Engineer Jardine used a logarithmic scale, like the decibel scale, to represent the Batvox likelihood ratios, so that each additional unit represents a factor of 10 increase in the likelihood ratio. A score can either be positive, indicating that it is likely that the caller is Fabrice, or negative, indicating that it is unlikely. A score between 0 and 1 is not considered very meaningful. A score of 1 indicates that it is 10 times more likely that the voice was Fabrice's than not. A score of 2 indicates that it is 100 times more likely than not, and so on.

Twenty-one calls executing carbon trades by the purported Mr. Brandao were compared to Fabrice's voice and others. A couple of the calls generated scores that were not meaningful, ranging from -0.04 to +0.27, so nothing much can be inferred from them. One call was noticeably negative, -1.64, indicating that it was between 10 and 100 times more likely that the caller was not Fabrice than that it was him. The bulk of the calls, however, were positive, and some extremely so. Eighteen calls scored over +1, and eight scored +6 or higher. A score of six indicates that it is 1,000,000 times more likely that the caller was Fabrice than not.

The likelihood ratios for the other voices did not come close to Fabrice's scores. His brother Mike, for example, had negative scores on 15 of the calls, and his brother Richard had negative scores on 14. And when they did have positive scores, they generally were below +1. The "imposter" voices, which are included just for error checking, scored even worse than Richard and Mike. Similarly, the

"imposter phone lines," generated negative scores when compared to Fabrice.

Agnitio, the company that developed Batvox, confirmed that Engineer Jardine, an expert in phonetics, is one of the most experienced users of their Batvox software suite, and has been certified at the highest level that Agnitio provides for Batvox (Level 3), which takes years of training.

> a). **An academic study demonstrated that Batvox is so effective that it can correctly distinguish between identical twins**

Hermann J. Künzel of the University of Marburg, Germany, used Batvox voice recognition software in an extremely demanding test: distinguishing the voices of identical twins. His study, published as *Automatic Speaker Recognition of Identical Twins*, in THE INTERNATIONAL JOURNAL OF SPEECH, LANGUAGE AND THE LAW, Vol. 17.2, 251–77 (2010), showed that Batvox software was able to distinguish correctly between each of nine pairs of male twins. The test was particularly hard because the voice exemplars included both spontaneous speech and reading aloud, and the correct twin's spontaneous speech was compared against his reading voice only, whereas it was compared to both the incorrect twin's spontaneous speech and reading aloud. Thus Batvox had to distinguish not only between identical twins, but to do so when the manner of speech – spontaneous or reading aloud – should have skewed the results toward the incorrect twin.

Each twin pair was arbitrarily divided between the "red" and "blue" twin. The voice models were created using the red twins' spontaneous speech only. The comparisons included the red twins reading aloud, the blue twins reading aloud, and the blue twins' spontaneous speech. As expected, the blue twins reading aloud – the

same manner of speech as used to generate the model - generated higher likelihood ratios than did the blue twins' spontaneous speech. Indeed, Batvox properly assigned negative or near zero likelihood ratios to the blue twins reading aloud in every instance even though these individuals were genetically identical to the red twins used to make the voice model.  And while Batvox did detect similarities between the red twins' and blue twins' spontaneous speech, typically assigning them positive likelihood ratios, those ratios were dwarfed by those assigned to a comparison of the red twins' spontaneous speech and reading aloud.  On average, Batvox generated likelihood ratios that were between 100 and 1,000 times greater for the correct twin using a different form of speech than it did for the incorrect twin using an identical form of speech.[2]

### D.   Evidence Fabrice Touil Received and Laundered the Fraud Proceeds

Fabrice Touil received much of the fraud proceeds through companies he controlled.  The proceeds took a complicated route. First, they were transferred from B Concept to at least six different business bank accounts in Russia, Cyprus, Portugal, and Hong Kong. They were then moved to at least three other business accounts, including one held by Euro Trade Energy, in Russia and Cyprus.  Then the proceeds were moved again to bank accounts in the names of Roter Ltd and Ageo HK Ltd in Latvia, Hong Kong, and Liechtenstein.

Roter Ltd's bank accounts in Latvia and Liechtenstein were controlled by Harnouf Haddoug, the brother of Fabrice Touil's friend

---

[2] The results of the study for female twins, while still good, were not as impressive, and are not included here because Fabrice Touil is male.

1  Raphael Haddock.   In late 2009 and early 2010, Roter Ltd transferred

2  over 11 million Euros ($12.4 million) to an account held by Ageo HK

3  Ltd in Liechtenstein, which had been opened by, and was controlled

4  by, Fabrice Touil.   In an attempt to justify this transfer, a fake

5  contract was drafted purportedly for the purchase by Roter Ltd of

6  seventeen works of art.   Invoices and delivery slips in connection

7  with the purchase were forged, and no art was in fact delivered.

8      According to bank documents from Liechtenstein, Fabrice Touil

9  had control of the Ageo HK Ltd account that ultimately received the

10  fraud proceeds.   Witnesses from a business called "France Offshore"

11  that sets up foreign corporations confirmed that Fabrice Touil

12  requested the incorporation of Ageo HK Ltd, as well as Tramex HK Ltd,

13  discussed later.   Fabrice Touil also opened an account in the name of

14  Ageo HK Ltd in Latvia, from which over 164,000 Euros ($183,000) was

15  transferred into a personal bank account held by Fabrice Touil.   In

16  addition, over 11 million Euros ($12.9 million) was transferred from

17  Fabrice Touil's Ageo HK Ltd account in Latvia to another account at

18  the same bank held in the name Howick Capital Corp, which bank

19  documents show was also controlled by Fabrice Touil; and over 6.7

20  million Euros ($7.5 million) was transferred from the Ageo HK Ltd

21  account to an account held by Tramex HK Ltd, which was also

22  controlled by Fabrice Touil.   As noted previously, Tramex is also one

23  of the shell businesses that Fabrice Touil incorporated through

24  France Offshore.

25      Fabrice Touil then used some of these funds to purchase real

26  estate in the United States.   From August 2011 to April 2013, over

27  $10 million was transferred from Fabrice Touil's Howick Capital Corp

28  and Ageo HK Ltd accounts to the Law Offices of Isaac Benmergui in

Florida, and was used to purchase real estate.  The purchases were made in the name of Fabrice Touil and business entities he controlled.  The properties were sold by Ocean Five Holding LLC, the listed representative of which is Audrey Lasry, Fabrice Touil's sister-in-law.

The fraud proceeds traced as described above are a fraction of the money that was credited to shell companies Fabrice Touil controlled.  For example, Fabrice Touil's Ageo HK Ltd bank account in Latvia was credited with over 33 million Euros between 2009 and 2013, while his Ageo HK Ltd bank account in Liechtenstein received over 11 million Euros in 2010 and 2011.

**E.   Additional Evidence of Fabrice Touil's Involvement in the Fraud and Money Laundering Conspiracies**

Other evidence of Fabrice Touil's involvement in the fraud and money laundering conspiracies includes the following:

  1.  <u>Many of the other conspirators are friends and family members of Fabrice Touil</u>

The investigating judge in France indicted Fabrice's brother, Mike Touil, as the main perpetrator of the VAT and money laundering conspiracy.  There is also an international arrest warrant outstanding for Fabrice's brother Richard Touil for having laundered the fraud proceeds.  Some of the proceeds of the fraud have gone to a company held in the name of Fabrice Touil's sister-in-law, Audrey Lasry.

Multiple witnesses testified that Fabrice Touil was friends with Raphael Haddouck and his brother Harnouf Haddoug.  The money that funded B Concept's initial purchase of carbon credits came from the Israeli bank account of Sarah Benattia, Raphael Haddouck's wife, and totalled 460,000 Euros.  Similarly, Harnouf Haddoug had power of

11

attorney over a bank account of Roter Limited, which was used to funnel money from the fraud to other accounts controlled by Fabrice Touil.   And Raphael Haddouck purported to be the representative of Roter Limited in a contract for a bogus art deal that was actually used to support money laundering, discussed below.   Raphael Haddouck fled from France and currently is in Israel.   There is an international warrant for his arrest.

            2.    An informant identified Fabrice Touil as one of the masterminds of the VAT swindle

Law enforcement in France received anonymous information that the Touil family had four brothers involved in a VAT swindle conspiracy that generated up to 100 million Euros in illicit gains, and that Fabrice and Mike Touil were the masterminds of the scheme. The informant requested anonymity out of fear of the Touil brothers. Similarly, Gregory Zaoui, who was indicted in France for a VAT fraud on the carbon market, told investigators that he had heard that Fabrice Touil would start a carbon trading business in Italy and Germany.

            3.    Fabrice Touil's company received fraud proceeds disguised as payments for art, but the art delivery documents were forged

From my training and experience prosecuting fraud and money laundering cases, I know that banks will flag transfers of funds that do not appear to be in the ordinary course of business, and require their customers to explain these suspicious transactions in order to comply with anti-money laundering laws and regulations.   As a result, money launderers will often falsely attempt to justify large and irregular transfers of funds as repayments of loans, or purchases of

1  high-value items such as art or real property, and provide
2  documentation that purports to confirm this.

3       France obtained from banks servicing the shell businesses
4  involved in this case documents that fit this pattern.  For example,
5  there is a "contract" for Roter Ltd to purchase 17 works of art for
6  different values generally in the hundreds of thousands of Euros
7  each, but ranging as high as 6.4 million Euros for one piece.
8  Similarly, there is an "invoice" that purports to bill Roter Ltd over
9  6.4 million Euros for art and calls for payment to be made to Fabrice
10 Touil's business Ageo HK Ltd in Liechtenstein.  While Hypo Investment
11 Bank Liechtenstein AG debited Roter Ltd's account 550,000 Euros for
12 the purported purchase of works by Louis Valtat and Georges D
13 Espagnat, the transportation company listed on the invoice and the
14 art gallery that was supposed to have sold the painting stated that
15 the invoice was forged and no delivery of the art had actually taken
16 place.

17       4.  Fabrice Touil declined to face the warrant in France
18       French investigators in this case called Fabrice Touil's
19 cellular telephone while they were executing a search warrant on his
20 residence in France on August 28, 2013.  After the detectives
21 identified themselves and asked if they were speaking to Fabrice
22 Touil, the person who answered the phone hung up.  That cellular
23 telephone number was then abandoned.  Fabrice Touil knows that he is
24 wanted in France, but has declined to appear there or travel
25 internationally, which might precipitate his arrest on France's
26 international arrest warrant:  he had a letter delivered in October
27 of 2014 to Judge Van Ruymbeke, who is investigating this case in
28 France, saying in part, "The [international] arrest warrant against

13

1  me [from France] blocks me and . . . prevents me from pursuing my

2  activities of [poker] player on an international scale."

3

4  6.    Fabrice Touil may be found within the jurisdiction of this court

5  at 2666 Hutton Drive, in Beverly Hills, California.  The house

6  located at this address was purchased in 2013 by "Real Estate 26

7  Investments LLC," which has as its registered agent the Law Offices

8  of Isaac Benmergui.  U.S. law enforcement agents have observed

9  Fabrice Touil at this residence in 2016.

10  7.    Elizabeth O'Connor, an attorney in the Office of the Legal

11  Adviser of the United States Department of State, has provided the

12  Department of Justice with a declaration authenticating a copy of the

13  diplomatic note by which the request for extradition was made and a

14  copy of the extradition treaty between the United States and France,

15  stating that the offenses for which extradition is demanded are

16  covered by the treaty, and confirming that the documents supporting

17  the request for extradition bear the certificate or seal of the

18  Ministry of Justice, or Ministry or Department responsible for

19  foreign affairs, of  France, in accordance with Article 11 of the

20  Extradition Treaty, so as to enable them to be received in evidence.

21  8.    The declaration from the Department of State with its

22  attachments, including a copy of the diplomatic note from the

23  requesting state, a copy of the relevant extradition treaty, and a

24  summary of the extradition exhibits are filed with this complaint and

25  incorporated by reference herein.  Also incorporated by reference are

26  the contemporaneously but separately filed DVD Exhibits in Support of

27  the Fabrice Touil Extradition Request.

28

9.    Fabrice Touil would be likely to flee if he learned of the existence of a warrant for his arrest.  Further, the contemporaneously filed DVD Exhibits in Support of the Fabrice Touil Extradition Request contain confidential personal identifying information and account numbers which cannot be redacted reliably because of their size and because some of them are in French.

WHEREUPON, complainant requests that a warrant be issued, in accordance with the Extradition Treaty, and Title 18, United States Code, Section 3184, for the arrest of Fabrice Touil, so that he may be arrested and brought before this Court "to the end that the evidence of criminality may be heard and considered"; and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed, but that the DVD Exhibits in Support of the Fabrice Touil Extradition Request remain under seal until further order of this Court.

Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

ANDREW BROWN
Assistant United States Attorney
Attorneys for Plaintiff
UNITED STATES OF AMERICA

Subscribed to before me and sworn in my presence this 8th day of July, 2016.

UNITED STATES MAGISTRATE JUDGE



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF ELIZABETH M.M. O'CONNOR

I, Elizabeth M.M. O'Connor, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Fabrice Touil. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and France are found in the Extradition Treaty between the United States of America and France, with Agreed Minute, signed on 23 April 1996, (the "1996 Treaty"), and the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty between the United States of America and France signed 23 April 1996, signed 30 September 2004 (the "Instrument"). Copies of the 1996 Treaty and Instrument are attached to this declaration

3. In accordance with the provisions of the 1996 Treaty and Instrument, the Embassy of France has submitted Diplomatic Note No. 2015-581106, dated 3 December 2015, formally requesting the extradition of Fabrice Touil, and the Ministry of Justice of France has submitted additional information to the U.S. Department of Justice by letter. Copies of the diplomatic note and the letter are attached to this declaration.

1

16010639-4

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

y That Elizabeth M.M O'Connor, whose name is subscribed to the document hereunto
as at the time of subscribing the same Attorney-Adviser, Office of the Legal Adviser,
of State, United States of America, and that full faith and credit are due to her acts as

*certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, John F. Kerry, Secretary of State , have
hereunto caused the seal of the Department of State to be affixed and
my name subscribed by the Assistant Authentication Officer, of the
said Department, at the city of Washington, in the District of
Columbia, this ninth day of December, 2015.

*Issued pur       o CHXIV,*
*Sept. 15,        l Stat. 68-*
*USC 2657          C 2651a;*
*301; 28 U         3 et. seq.; 8*
*1443(f);          Federal Ru*
*Civil Proced*

By_____

_____
Secretary of State

_____
Assistant Authentication Officer,
Department of State

2

-2-

4. In accordance with Article 22 of the 1996 Treaty, the United States provides legal representation in the U.S. courts for France in its extradition requests, and France provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article 2 of the 1996 Treaty.

6. Under Article 11 of the 1996 Treaty, as amended by Item II of the Instrument, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in Paris. France, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the Treaty and Instrument with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 8th, 2015.

ELIZABETH M.M. O'CONNOR

Attachments:
    1. Copies of Note and Letter.
    2. Copies of Treaty and Protocol.

3



*Ambassade de France*
*aux États-Unis*

UNOFFICIAL TRANSLATION

Re: Extradition of Mr. Fabrice TOUIL

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Fabrice TOUIL, born on Mai 20th, 1976, in Paris (France), a French national. On June 3rd, 2014, he was issued an arrest warrant by the first vice-president of the district court of Paris (France) for gang fraud on the value-added tax and money-laundering on the value-added tax by organized crime.

This request, accompanied by an English translation, is transmitted pursuant to the Extradition Treaty between the United States of America and France, with Agreed Minute, signed on April 23rd, 1996 (the "1996 Treaty") and the Instrument as contemplated by Article 3, paragraph 2 of the Agreement on Extradition between the United States of America and the European Union signed on June 25th, 2003, as to the application of the Extradition Treaty between the United States of America and France signed April 23rd, 1996, signed September 30th, 2004 (the "Instrument").

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, December 3rd, 2015

Department of State
Mrs. Amber KLUESENER
Supervisory Paralegal Specialist
Office of The Legal Advisor – Law Enforcement & Intelligence

Department of Justice
Mr. Kenneth Harris
Office of International Affairs

4

Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition
between the United States of America and the European Union signed 25 June 2003,
as to the application of the Extradition Treaty between
the United States of America and France signed 23 April 1996

As contemplated by Article 3, paragraph 2, of the Agreement on Extradition between the United
States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU
Extradition Agreement"), the Governments of the United States of America and the French
Republic acknowledge that, in accordance with the provisions of this Instrument, the U.S.-EU
Extradition Agreement is applied in relation to the bilateral Extradition Treaty between the United
States of America and France signed 23 April 1996 (hereafter "the 1996 Treaty on Extradition")
under the following terms:

I

A.   Article 5, paragraph 1, of the U.S.-EU Extradition Agreement provides:

"Requests for extradition and supporting documents shall be transmitted through the
diplomatic channel, which shall include transmission as provided for in Article 7."

B.   Article 5, paragraph 1, of the U.S.-EU Extradition Agreement shall govern the mode of
transmission of the extradition request and supporting documents and shall be applied in
place of Article 10, paragraph 1, of the 1996 Treaty on Extradition. For purposes of
applying its terms, the reference to "Article 7" refers to Part III of this Instrument.

II

A.   Article 5, paragraph 2, of the U.S.-EU Extradition Agreement provides:

"Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or
Department responsible for foreign affairs, of the requesting State shall be admissible in
extradition proceedings in the requested State without further certification, authentication,
or other legalization."

B.   Article 5, paragraph 2, of the U.S.-EU Extradition Agreement shall govern the
requirements concerning certification, authentication or legalization of the extradition
request and supporting documents, and shall be applied in place of Article 11 of the 1996
Treaty on Extradition. For purposes of applying its terms, "Ministry of Justice" means, for
France, the Ministry of Justice of France and, for the United States of America, the United
States Department of Justice; "Ministry or Department responsible for foreign affairs"
means, for France, the Ministry of Foreign Affairs of France, and for the United States of
America, the United States Department of State.

III

A.   Article 7, paragraph 1, of the U.S.-EU Extradition Agreement provides:

"If the person whose extradition is sought is held under provisional arrest by the requested
State, the requesting State may satisfy its obligation to transmit its request for extradition
and supporting documents through the diplomatic channel pursuant to Article 5(1), by
submitting the request and documents to the Embassy of the requested State located in the
requesting State. In that case, the date of receipt of such request by the Embassy shall be
considered to be the date of receipt by the requested State for purposes of applying the time
limit that must be met under the applicable extradition treaty to enable the person's
continued detention."

B.   Article 7, paragraph 1, of the U.S.-EU Extradition Agreement shall provide an alternative
method for transmission of the request for extradition and supporting documents following
provisional arrest, and shall supplement the provisions of Articles 10 and 13 of the 1996
Treaty on Extradition. For purposes of applying its terms, the reference to "Article 5(1)"
relates to Part I of this Instrument.

1

## IV

A.   Article 10 of the U.S.-EU Extradition Agreement provides:

"Requests for extradition or surrender made by several states

1.   If the requested State receives requests from the requesting State and from any other State or States for the extradition of the same person, either for the same offence or for different offences, the executive authority of the requested State shall determine to which State, if any, it will surrender the person.

2.   If a requested Member State receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offence or for different offences, the competent authority of the requested Member State shall determine to which State, if any, it will surrender the person. For this purpose, the competent authority shall be the requested Member State's executive authority if, under the bilateral extradition treaty in force between the United States and the Member State, decisions on competing requests are made by that authority; if not so provided in the bilateral extradition treaty, the competent authority shall be designated by the Member State concerned pursuant to Article 19.

3.   In making its decision under paragraphs 1 and 2, the requested State shall consider all of the relevant factors, including, but not limited to, factors already set forth in the applicable extradition treaty, and, where not already so set forth, the following:

   (a)   whether the requests were made pursuant to a treaty;

   (b)   the places where each of the offences was committed;

   (c)   the respective interests of the requesting States;

   (d)   the seriousness of the offences;

   (e)   the nationality of the victim;

   (f)   the possibility of any subsequent extradition between the requesting States; and

   (g)   the chronological order in which the requests were received from the requesting States."

B.   Article 10 of the U.S.-EU Extradition Agreement shall govern the decision on requests made by several States for the extradition or surrender of the same person and shall be applied in place of Article 17 of the 1996 Treaty on Extradition. For purposes of Article 10, paragraph 2, and Article 19 of the U.S.-EU Extradition Agreement, if France receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, the "Chambre de l'instruction de la  Cour d'Appel" shall be the competent authority to determine to which State the person will be surrendered.

## V

A.   Article 11 of the U.S.-EU Extradition Agreement provides:

"Simplified extradition procedures

If the person sought consents to be surrendered to the requesting State, the requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The consent of the person sought may include agreement to waiver of protection of the rule of specialty."

B.   Article 11 of the U.S.-EU Extradition Agreement shall govern the use of simplified extradition procedures and shall supplement the provisions of the 1996 Treaty on Extradition.

2

8



VI

A.    Article 13 of the U.S.-EU Extradition Agreement provides:

"Capital punishment

Where the offence for which extradition is sought is punishable by death under the laws in the requesting State and not punishable by death under the laws in the requested State, the requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the requesting State, on condition that the death penalty if imposed shall not be carried out.  If the requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions.  If the requesting State does not accept the conditions, the request for extradition may be denied."

B.    Article 13 of the U.S.-EU Extradition Agreement shall govern extradition with respect to conduct punishable by death in the Requesting State and shall be applied in place of Article 7 of the 1996 Treaty on Extradition.

VII

A.    Article 14 of the U.S.-EU Extradition Agreement provides:

"Sensitive information in a request

Where the requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the requested State to determine the extent to which the information can be protected by the requested State.  If the requested State cannot protect the information in the manner sought by the requesting State, the requesting State shall determine whether the information shall nonetheless be submitted."

B.    Article 14 of the U.S.-EU Extradition Agreement shall govern consultations where the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition, and shall supplement the provisions of the 1996 Treaty on Extradition.

VIII

In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

This Instrument shall not apply to requests for extradition made prior to its entry into force.

IX

This Instrument shall be subject to the completion by the United States of America and France of any necessary applicable internal procedures for entry into force.  The Governments of the United States of America and the French Republic shall thereupon exchange instruments indicating that any such measures have been completed.  This Instrument shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

In the event of termination of the U.S.-EU Extradition Agreement, this Instrument shall be terminated and the 1996 Treaty on Extradition shall be applied.

3

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at The Hague, in duplicate, this 30 day of September 2004, in the English and French languages, both texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE FRENCH REPUBLIC:

4

| 105TH CONGRESS<br>*1st Session* | SENATE | TREATY DOC.<br>105–13 |
|---|---|---|

## EXTRADITION TREATY WITH FRANCE

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

EXTRADITION TREATY BETWEEN THE UNITED STATES OF
AMERICA AND FRANCE, SIGNED AT PARIS ON APRIL 23, 1996



JULY 9, 1997.—Treaty was read the first time and, together with the
accompanying papers, referred to the Committee on Foreign Relations
and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1997

39–118



## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *July 9, 1997.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty between the United States of America and France, signed at Paris on April 23, 1996.

In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Treaty. As the report explains, the Treaty will not require implementing legislation.

This Treaty will, upon entry into force, enhance cooperation between the law enforcement communities of both countries. It will thereby make a significant contribution to international law enforcement efforts.

The provisions in this Treaty, which includes an Agreed Minute, follow generally the form and content of extradition treaties recently concluded by the United States.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

(III)

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, June 13, 1997.*

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty between the United States of America and France ("the Treaty"), signed at Paris on April 23, 1996. I recommend that the treaty, which includes an Agreed Minute, be transmitted to the Senate for its advice and consent to ratification.

In many respects, the Treaty follows closely the form and content of extradition treaties recently concluded by the United States. Some of the Treaty's provisions, however, differ from those found in most of our other modern extradition treaties for reasons discussed in the Technical Analysis produced by the United States negotiating delegation. The treaty represents part of a concerted effort by the Department of State and the Department of Justice to develop modern extradition relationships to enhance the United States ability to prosecute serious offenders including, especially, narcotics traffickers and terrorists.

The Treaty marks a significant step in bilateral cooperation between the United States and France. Upon entry into force, it will replace the Treaty of Extradition between the United States of America and the Republic of France signed at Paris on January 6, 1909, and entered into force on July 27, 1911, and the Supplementary Extradition Convention signed at Paris on February 12, 1970, with exchanges of letters of June 2 and 11, 1970, and entered into force on April 3, 1971. That treaty has become outmoded, and the new Treaty will provide significant improvements. The Treaty can be implemented without legislation.

Article 1 obligates each Contracting State to extradite to the other, pursuant to the provisions of the Treaty, any person whom the competent authorities in the Requesting State have charged with or convicted of an extraditable offense.

Article 2(1) defines extraditable offenses as acts punished under the laws of both States by deprivation of liberty for a maximum of at least one year, or by a more severe penalty. Use of such a "dual criminality" clause rather than a list of offenses covered by the Treaty obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws of both Contracting States.

Article 2(2) defines an extraditable offense to include also an attempt or a conspiracy to commit, or participation in the commission of, an extraditable offense.

Additional flexibility is provided by Article 2(3), which provides that an offense shall be considered an extraditable offense: (1) whether or not the laws in the Contracting States place the offense

(V)

13



VI

within the same category of offenses or describe the offense by the same terminology; or (2) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

With regard to an offense committed outside the territory of the Requesting State, Article 2(4) provides that extradition shall be granted when the laws of the Requested State authorize the prosecution or provide for the punishment of that offense in similar circumstances. The United States recognizes the extraterritorial application of many of its criminal statutes and frequently makes requests for fugitives whose criminal activity occurred in foreign countries with the intent, actual or implied, of affecting the United States.

If an extradition request concerns distinct acts, each punishable by deprivation of liberty in both States but not all of which meet the requirements of Article 2(1) and 2(2), Article 2(5) nevertheless requires extradition for all of the acts.

Article 2(6) provides that extradition shall be granted pursuant to the terms of Article 2(1) and 2(2) in matters concerning tax, customs duty, and foreign exchange offenses.

Article 3(1) declares that neither State has an obligation to extradite its own nationals, but the executive authority of the United States shall have the discretion to do so. The nationality of the person sought shall be the nationality of the person at the time the offense was committed.

Article 3(2) requires a State that refuses an extradition request solely on the basis of the nationality of the person sought to submit the case to its authorities for prosecution, if so requested by the Requesting State.

As is customary in extradition treaties, Article 4 incorporates a political offense exception to the obligation to extradite. Article 4(1) states that France shall not grant extradition for an offense considered by France to be a political offense, an offense connected with a political offense, or an offense inspired by political motives. Article 4(1) also states that the United States shall not grant extradition for an offense considered by the United States to be a political offense.

Article 4(2) specifies six categories of offenses that shall not be considered to be political offenses:

(a) a murder or other willful crime against the person of a Head of State of one of the Contracting States, or of a member of the Head of State's family, or any attempt or conspiracy to commit, or participation in, any of the foregoing offenses;

(b) an offense for which both Contracting Parties are obliged pursuant to a multilateral agreement to extradite the requested person or to submit the case to their competent authorities for decision as to prosecution;

(c) a serious offense involving an attack against the life, physical integrity or liberty of internationally protected persons, including diplomatic agents;



(d) an offense involving kidnapping, the taking of a hostage or any other form of unlawful detention;

(e) an offense involving the use of a bomb, grenade, rocket, automatic firearm or letter or parcel bomb if this use endangers persons; or

(f) an attempt or conspiracy to commit, or participation in, any of the offenses listed in paragraphs 2(b), 2(c), 2(d) or 2(e) above.

Article 4(3) creates a regime similar to that of the European Convention on Terrorism, in that the Requested State may deny extradition for any of the offenses mentioned in paragraphs 2(b)-2(f) above, in accordance with the provisions of Article 4(1). However, in evaluating the character of an offense, the Requested State is required to consider its particularly serious nature, if applicable, including that it created a collective danger to life, physical integrity or liberty of persons, that it affected persons not connected to the motives behind it, or that cruel or treacherous means were used in the commission of the offense.

Article 4(4) provides that extradition shall not be granted if the executive authority in the case of the United States or the competent authorities in the case of France have substantial grounds for believing that the request was for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality or political opinions.

Article 5 permits the parties to deny extradition for an offense that is exclusively a military offense (for example, desertion).

Article 6 permits denial of an extradition request when surrender of the person might entail exceptionally serious consequences related to age or health.

Article 7(1) permits denial of an extradition request for an offense punishable by death in the Requesting State but not in the Requested State, unless the Requesting State provides the assurance that the death penalty will not be imposed or, if imposed, will not be carried out. Article 7(2) declares that the death penalty, if imposed by the courts of the Requesting State, shall not be carried out in instances when a Requesting State has provided an assurance in accordance with Article 7(1).

Article 8 bars extradition when the person sought has been convicted or acquitted in the Requested State for the same offense, but does not bar extradition if the competent authorities in the Requested State have declined to prosecute or have decided to discontinue criminal proceedings against the person sought.

Article 9 states that extradition shall be denied if prosecution or execution of the penalty would be barred by the lapse of time under the laws of the Requested State, but requires that acts in the Requesting State that would interrupt or suspend the prescriptive period are to be taken into account by the Requested State to the extent possible under its laws.

Article 10 establishes the procedures and describes the documents that are required to support an extradition request. The Article requires that all requests for extradition be submitted through the diplomatic channel. Article 10(3)(c) provides that a request for the extradition of a person sought for prosecution be supported by a duly authenticated copy of the warrant or order of arrest and, for



requests by the United States, the charging document, or for requests by France, the original or a duly authenticated copy of the warrant or order of arrest and such information as would justify the committal for trial of the person if the offense had been committed in the United States.

Article 11 establishes the procedures under which documents submitted pursuant to the provisions of this Treaty shall be received and admitted into evidence in each State.

Article 12 requires all documents submitted by the Requesting State to be translated into the language of the Requested State.

Article 13 sets forth procedures for the provisional arrest and detention of a person sought pending presentation of the formal request for extradition. A request for provisional arrest may be submitted directly between the U.S. Department of Justice and the Ministry of Justice of the French Republic by means of the facilities of the International Criminal Police Organization (INTERPOL) or through the diplomatic channel. Article 13(4) provides that if the Requested State's executive authority has not received the request for extradition and supporting documentation within sixty days after the provisional arrest, the person may be discharged from custody. Article 13(5) provides explicitly that discharge from custody pursuant to Article 13(4) does not prejudice subsequent rearrest and extradition upon later delivery of the extradition request and supporting documents.

Article 14 sets forth procedures by which the Requested State may seek additional information in support of an extradition request to fulfill the requirements of the Treaty and provides for release from custody of a person under arrest for purposes of extradition if the additional information is not sufficient or not received within the time specified.

Article 15, specifies the procedures governing surrender and return of persons sought. It requires the Requested State to provide prompt notice to the Requesting State through the diplomatic channel regarding its extradition decision. If the request is denied in whole or in part, Article 15(2) requires the Requesting State to provide information regarding the reasons therefor. If extradition is granted, the authorities of the Contracting States shall agree on the date and place for surrender of the person sought. If the person is not removed from the territory of the United States within the time prescribed by its law or within 30 days from the surrender date set in accordance with Article 15(3) in the case of France, that person may be discharged from custody and the Requested State may subsequently refuse extradition for the same offense.

Article 16 concerns temporary and deferred surrender. If a person whose extradition is sought is being prosecuted or is serving a sentence in the Requested State, that State may temporarily surrender the person to the Requesting State solely for the purpose of prosecution. Alternatively, the Requested State may postpone the extradition proceedings until its prosecution has been concluded and the sentence has been served.

Article 17 sets forth a non-exclusive list of factors to be considered by the Requested State in determining to which State to surrender a person sought by more than one State.

IX

Article 18 provides for the seizure and surrender to the Requesting State of property connected with the offense for which extradition is granted, to the extent permitted under the law of the Requested State. Such property may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought. Surrender of property may be deferred if it is needed as evidence in the Requested State and may be conditioned upon satisfactory assurances that it will be returned to the Requested State as soon as practicable. Article 18(3) imposes an obligation to respect the rights of third parties in affected property.

Article 19 sets forth the rule of speciality. It provides, subject to specific exceptions, that a person extradited under the Treaty may not be detained, tried, convicted, punished, or subjected to any restriction of his freedom for an offense other than that for which extradition has been granted, unless the Requested State has given it consent or the extradited person leaves the Requesting State after extradition and voluntarily returns to it or fails to leave the Requesting State within thirty days of being free to do so. Article 19(2) addresses situations where the denomination of an offense for which a person has been extradited is altered during the proceedings in the Requested State.

Article 20 provides that the Requesting State may not extradite a person to a third State for an offense committed prior to the original surrender unless the Requested State consents or the person did not leave the territory of the Requesting State within thirty days when given an opportunity to do so, or returned after having left it.

Article 21 governs the transit through the territory of one Contracting State of a person being surrendered to the other State by a third State.

Article 22 contains provisions on representation and expenses. The Requested State is required to advise and assist the Requesting State in accordance with the Agreed Minute on Representation that forms an integral part of the Treaty and is discussed in detail in the Technical Analysis.

Under Article 22(2), the Requesting State is required to bear the expenses related to the translation of documents and the transportation of the person surrendered. Article 22(3) clarifies that neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under the Treaty.

Article 23 states that the United States Department of Justice and the Ministry of Justice of the French Republic may consult with each other directly or through the facilities of INTERPOL in connection with the processing of individual cases and in furtherance of maintaining and improving Treaty implementation procedures.

Article 24(1), like the parallel provision in almost all recent United States extradition treaties, states that the Treaty shall apply to offenses committed before as well as after the date the Treaty enters into force. Upon entry into force of the Treaty, Article 24(2) provides that the current Treaty of Extradition between the United States and France signed January 6, 1909 and the Supplementary Convention signed February 12, 1970, with exchanges of letters

x

signed June 2 and 11, 1970, shall cease to have effect, except for any proceedings in which extradition documents have already been submitted to the courts of the Requested State at the time the Treaty enters into force.

Article 25 provides that each Contracting State shall notify the other of the completion of the constitutional procedures required for ratification of the Treaty, and the Treaty shall enter into force on the first day of the second month following the date of receipt of the last notification.

Under Article 26, either Contracting State may terminate the Treaty at any time upon written notice to the other Contracting State, with termination effective six months after the date of receipt of such notice.

As noted above, a Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty, including the Agreed Minute, by the Senate at an early date.

Respectfully submitted,

MADELEINE ALBRIGHT.



EXTRADITION TREATY

BETWEEN

THE UNITED STATES OF AMERICA

AND

FRANCE

(1)



2

The President of the United States of America and the
President of the French Republic,

Recalling the Extradition Treaty and accompanying
Protocol between the United States of America and the Republic
of France signed at Paris January 6, 1909 and the Supplementary
Convention signed at Paris February 12, 1970 with Exchanges of
Letters of June 2 and 11, 1970;

Noting that these treaties continue in force between the
Government of the United States of America and the Government
of the French Republic until entry into force of this Treaty;
and

Desiring to provide for more effective cooperation
between the two States in the suppression of crime and to
facilitate relations between the two States in the area of
extradition by concluding a treaty for the extradition of
offenders;

Have decided to conclude a new extradition treaty and
have appointed as their plenipotentiaries for this purpose:

The President of the United States of America:

The Honorable, Janet Reno, Attorney General of the
United States of America;

The President of the French Republic:

The Honorable, Jacques Toubon, Minister of Justice;

Who, having communicated to each other their respective
full powers, which were found in good and due form, have agreed
as follows:

3

-2-

## Article 1

### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the competent authorities in the Requesting State have charged with or found guilty of an extraditable offense.

## Article 2

### Extraditable Offenses

1. Acts shall be extraditable if they are punished under the laws in both States by deprivation of liberty for a maximum of at least one year or by a more severe penalty. If extradition is requested for purposes of enforcing a judgment, the time remaining to be served must be at least six months.

2. An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of, an offense described in paragraph 1.

3. For the purposes of this Article, an offense shall be an extraditable offense:

    (a) whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology; or

T. DOC 105-13 - 2



4

-3-

(b)  whether or not the offense is one for which
United States federal law requires proof of an
element of proof, such as passage from one
state to another, the use of the mails, wire,
and other facilities of interstate or foreign
commerce, or the effects upon such commerce,
since such an element is required for the sole
purpose of establishing the jurisdiction of
United States federal courts.

4.  Extradition shall be granted for an extraditable
offense committed outside the territory of the Requesting
State, when the laws of the Requested State authorize the
prosecution or provide for the punishment of that offense in
similar circumstances.

5.  If the extradition request concerns distinct acts,
each punishable under the laws of the two States by the
deprivation of liberty, and if some of the acts do not fulfill
the conditions set forth in Paragraphs 1 and 2 of this Article,
the Requested State shall nonetheless grant extradition based
upon such acts.

6.  In matters concerning tax, customs duty, and
foreign exchange offenses, extradition shall be granted
pursuant to the terms set forth in paragraphs 1 and 2 of this
Article.

5

-4-

### Article 3
### Nationality

1.   There is no obligation upon the Requested State to grant the extradition of a person who is a national of the Requested State, but the executive authority of the United States shall have the power to surrender a national of the United States if, in its discretion, it deems it proper to do so.  The nationality of the person sought shall be the nationality of that person at the time the offense was committed.

2.   If extradition is refused solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its authorities for prosecution.

### Article 4
### Political Offenses

1. . Extradition shall not be granted by France when the offense for which extradition is requested is considered by France as a political offense or as an offense connected with a political offense or as an offense inspired by political motives.  Extradition shall not be granted by the United States when the offense for which extradition is requested is considered by the United States to be a political offense.

6

-5-

2. For the purposes of this Treaty, and in accordance with paragraph 1 of this Article, the following offenses shall not be considered to be political offenses:

    (a)  a murder or a willful crime against the person of a Head of State of one of the Contracting States, or a member of his or her family, or any attempt or conspiracy to commit, or participation in, any of the foregoing offenses;

    (b)  an offense for which both Contracting States are obliged pursuant to a multilateral agreement to extradite the requested person or to submit the case to the competent authorities for decision as to prosecution;

    (c)  a serious offense involving an attack against the life, physical integrity or liberty of internationally protected persons, including diplomatic agents;

    (d)  an offense involving kidnapping, the taking of a hostage or any other form of unlawful detention;

    (e)  an offense involving the use of a bomb, grenade, rocket, automatic firearm or letter or parcel bomb if this use endangers persons; or



7

-6-

(f) an attempt or conspiracy to commit, or participation in, any of the offenses listed in paragraphs 2(b), 2(c), 2(d) or 2(e) of this Article.

3. The Requested State may deny extradition of persons who committed any of the offenses mentioned in paragraphs 2(b), 2(c), 2(d), 2(e), and 2(f) of this Article pursuant to the provisions of paragraph 1 of this Article.

In evaluating the character of the offense, the Requested State shall take into consideration the particularly serious nature of the offense, including:

(a) that it created a collective danger to the life, physical integrity or liberty of persons;

(b) that it affected persons foreign to the motives behind it; or

(c) that cruel or treacherous means have been used in the commission of the offense.

4. Extradition shall not be granted if the executive authority in the case of the United States or the competent authorities in the case of France have substantial grounds for believing that the request was for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality or political opinions.



8

-7-

### Article 5
#### Military Offenses

Extradition shall not be granted if the offense in respect of which it is requested is exclusively a military offense.

### Article 6
#### Humanitarian Considerations

This Treaty does not prevent the executive authority in the case of the United States or the competent authorities in the case of France from denying extradition when surrender of the person might entail exceptionally serious consequences related to age or health.

### Article 7
#### Capital Punishment

1.  When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State may refuse extradition unless the Requesting State provides the assurance that the death penalty will not be imposed or, if imposed, will not be carried out.



9

-8-

2. In instances in which a Requesting State provides the assurance in accordance with this Article, the death penalty, if imposed by the courts of the Requesting State, shall not be carried out.

## Article 8
### Prior Prosecution

1. Extradition shall not be granted when the person sought has been finally convicted or acquitted in the Requested State for the offense for which extradition is requested.

2. Extradition shall not be refused on the grounds that the authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested, or to discontinue any criminal proceedings which have been instituted against the person sought for those acts.

## Article 9
### Lapse of Time

1. Extradition shall be denied if prosecution of the offense or execution of the penalty has been barred by lapse of time under the laws of the Requested State.

2. Acts in the Requesting State that would interrupt or suspend the prescriptive period are to be taken into account by the Requested State to the extent possible under its laws.



10

-9-

Article 10

Extradition Procedures and Required Documents.

1.   All requests for extradition shall be submitted through the diplomatic channel.

2.   All requests shall be supported by:

(a)   documents, statements, or other types of information which state the nationality, probable location, and also describe the identity of the person sought in order to establish that the person is the subject of the prosecution or conviction;

(b)   information describing the facts of the offense and the procedural history of the case;

(c)   the text of the provisions describing the offense for which extradition is requested; and

(d)   the text of the law prescribing the punishment for the offense.

3.   A request for extradition of a person who is sought for prosecution shall also be supported by:

(a)   in the case of a request submitted by the United States, a duly authenticated copy of the warrant or order of arrest and the charging document; or

11

-10-

(b) in the case of a request submitted by France, an original or a duly authenticated copy of the warrant or order of arrest and such information as would justify the committal for trial of the person if the offense had been committed in the United States.

4. A request for extradition relating to a person who has been found guilty or convicted of the offense for which extradition is sought shall also be supported by:

(a) in the case of a request by the United States, if the person has been convicted, the original or a duly authenticated copy of the final judgment of conviction, or, if the person has been found guilty but has not yet been sentenced, a statement by a judicial authority that the person has been found guilty, and a duly authenticated copy of the warrant of arrest;

(b) in the case of a request by France, the original or a duly authenticated copy of the final judgment of conviction;

(c) in all cases where a sentence has been imposed, a statement of the remainder of the sentence to be served; and

(d) in the case of a person who has been found guilty in absentia, the documents required by paragraph 3.

12

-11-

### Article 11
#### Admissibility of Documents

The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a)  in the case of a request from the United States, they are transmitted through the diplomatic channel;

(b)  in the case of a request from France, they are certified by the principal diplomatic or principal consular officer of the United States resident in France, as provided by the extradition laws of the United States, or they are certified or authenticated in any other manner accepted by the laws of the United States.

### Article 12
#### Translation

All documents submitted by the Requesting State shall be translated into the language of the Requested State.

13



-12-

Article 13

Provisional Arrest

1.   In case of urgency, a Contracting State may request the provisional arrest of the person sought pending presentation of the request for extradition.  A request for provisional arrest may be transmitted directly between the United States Department of Justice and the Ministry of Justice of the French Republic, by means of the facilities of the International Criminal Police Organization (INTERPOL), or through the diplomatic channel.

2.   The application for provisional arrest shall contain:

(a)  a description of the person sought and information concerning the person's nationality;

(b)  the location of the person sought, if known;

(c)  a brief statement of the facts of the case, including the location and approximate date of the offense;

(d)  a description of the laws violated;

(e)  a statement of the existence of a warrant of arrest or a finding of guilt or judgment of conviction against the person sought; and

(f)  a statement that a request for extradition for the person sought will follow.



14

-13-

3.   The Requesting State shall be notified without delay of the disposition of its application and the reasons for any denial.

4.   A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the Requested State has not received the formal request for extradition and the supporting documents required by Article 10.

5.   The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 14
Additional Information

1.   If the Requested State considers that the information furnished in support of a request for extradition is not sufficient to fulfill the requirements of this Treaty, that State may request that additional information be furnished within such reasonable length of time as it specifies. Such additional information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of France or through the diplomatic channel.



15

-14-

2.   If the person sought is under arrest for purposes of extradition and the additional information furnished is not sufficient or is not received within the time specified, the person may be released from custody.   Such release shall not preclude the Requesting State from making another request in respect of the same or any other offense.

3.   When the person is released from custody in accordance with paragraph 2, the Requested State shall notify the Requesting State as soon as practicable.

Article 15
Decision and Surrender

1.   The Requested State shall notify as soon as possible the Requesting State of its decision on the request for extradition.

2.   If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial.   The Requested State shall provide copies of pertinent judicial decisions upon request.

3.   If the request for extradition is granted, the authorities of the Contracting States shall agree on the date and place for the surrender of the person sought.   The Requested State shall also notify the Requesting State of the length of time the person has spent in detention for purposes of extradition.

16

-15-

4.  If the person sought is not removed from the territory of the Requested State within the time prescribed by its law in the case of the United States, or in the case of France within 30 days from the date set for the surrender in accordance with paragraph 3 of this Article, that person may be discharged from custody, and the Requested State may subsequently refuse extradition for the same offense.

5.  In the event circumstances beyond the control of either Contracting State prevent the surrender or reception of the person sought, the Contracting States shall agree on a new date for the surrender, and the provisions of paragraph 4 of this Article shall apply.

Article 16
Temporary and Deferred Surrender

1.  If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting States.

17



-16-

2.   The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded and any sentence has been served.

Article 17
Requests for Extradition Made by Several States

If the Requested State receives requests from the other Contracting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority in the case of the United States and the competent authorities in the case of France shall determine to which State the person will be surrendered.  In making its decision, the Requested State shall consider all relevant factors, including but not limited to: whether the requests were made pursuant to treaty; the place where each offense was committed; the respective interests of the requesting States;  the gravity of the offenses; the nationality of the person sought and the victim; the possibility of further extradition between the requesting States; and the chronological order in which the requests were received from the requesting States.



18

-17-

Article 18

Seizure and Surrender of Property

1.   To the extent permitted under its law, the
Requested State may seize and surrender to the Requesting State
all articles, documents, and evidence connected with the
offense in respect of which extradition is granted.  The
articles, documents, and evidence mentioned in this Article may
be surrendered even when the extradition cannot be effected
because of the death, disappearance, or escape of the person
sought.

2.   The Requested State may condition the surrender of
the property upon satisfactory assurances from the Requesting
State that the property will be returned to the Requested State
as soon as practicable.  The Requested State may also defer the
surrender of such property if it is needed as evidence in the
Requested State.

3.   The rights of third parties in such property shall
be duly respected.

Article 19

Rule of Speciality

1.   A person extradited under this Treaty shall not be
detained, tried, convicted, punished, or subjected to any
restriction of his freedom in the territory of the Requesting



19

-18-

State for any act prior to the person's surrender, other than the offense for which extradition has been granted, except in the following cases:

(a) when the Requested State has given its consent. A request for such purpose may be submitted, together with the documents listed in Article 10, and any statements made by the person extradited concerning the offense for which the consent of the Requested State is requested; or .

(b) when, having had the opportunity to do so, the person extradited did not leave the territory of the Requesting State within 30 days of his final release, or returned to the territory of the Requesting State after having left it.

2. If the denomination of the offense for which a person has been extradited is altered during the proceedings under the laws of the Requesting State or such a person is charged with a differently denominated offense, the person shall be prosecuted or sentenced provided the offense under its new legal description is:

(a) based on the same set of facts contained in the extradition request and its supporting documents; and

(b) punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which he was extradited.



20

-19-

## Article 20
### Reextradition to a Third State

1.  When a person has been surrendered by the Requested State to the Requesting State, the Requesting State shall not surrender the person extradited to a third State for an offense prior to the person's surrender, unless:

    (a)  the Requested State consents to such surrender; or

    (b)  the person extradited, having had the opportunity to do so, did not leave the territory of the Requesting State within 30 days of the person's final release, or returned to the territory of the Requesting State after having left it.

2.  Before granting a request under paragraph 1(a) above, the Requested State may request the documents referred to in Article 10, and any statements made by the person extradited with respect to the offense for which the consent of the Requested State is requested.


## Article 21
### Transit

1.  Either Contracting State may authorize transportation through its territory of a person surrendered to the other State by a third State.  A request for transit shall

21



-20-

be made through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the French Republic. The facilities of INTERPOL may also be used to transmit such a request. It shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2. No authorization is required where air transportation is being utilized by one Contracting State and no landing is scheduled on the territory of the other Contracting State. If an unscheduled landing occurs on the territory of the other Contracting State, that Contracting State may require the request for transit as provided in paragraph 1. That Contracting State shall detain the person to be transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing.

Article 22
Representation and Expenses

1. The Requested State shall advise and assist the Requesting State in connection with a request for extradition. Such advice and assistance shall be rendered in accordance with the provisions of the accompanying agreed minute, which shall form an integral part of this Treaty.



22

-21-

2.   The Requesting State shall bear the expenses related to the translation of documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3.   Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under this Treaty.

Article 23
Consultation

The United States Department of Justice and the Ministry of Justice of the French Republic may consult with each other directly or through the facilities of INTERPOL in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

Article 24
Application

1.   This Treaty shall apply to offenses committed before as well as after the date it enters into force.



23

-22-

   2.  Upon the entry into force of this Treaty, the
Treaty of Extradition between the United States of America and
the Republic of France signed at Paris January 6, 1909 and the
Supplementary Convention signed at Paris February 12, 1970 with
Exchanges of Letters signed at Paris June 2 and 11, 1970, shall
cease to have effect between the United States of America and
the French Republic.  Nevertheless, the 1909 Treaty, as
supplemented in 1970, shall apply to any extradition
proceedings in which extradition documents have already been
submitted to the courts of the Requested State at the time this
Treaty enters into force.


                    Article 25
            Ratification and Entry into Force


     Each Contracting State shall notify the other of the
completion of the constitutional procedures required for the
ratification of this Treaty.  The Treaty shall enter into force
on the first day of the second month following the date of
receipt of the last notification.



24

-23-

Article 26

Termination

Either Contracting State may terminate this Treaty at any time by giving written notice to the other Contracting State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF, the respective Plenipotentiaries have signed this Treaty.

DONE at Paris, in duplicate, this 23rd day of April, 1996, in the English and French languages, both texts being equally authentic.